UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED

03 JUN 17 AM 11: 22

U.S. DISTRICT COURT
N.D. OF ALABAMA

CARL LEE TANNIEHILL,       )
                           )
        Plaintiff,         )
                           )
vs.                        )       Civil Action No. CV-01-S-2765-S
                           )
SAIIA CONSTRUCTION, L.L.C.,)
                           )
        Defendant.         )

**ENTERED**

JUN 17 2003

**MEMORANDUM OPINION**

Plaintiff, Carl Lee Tanniehill, originally claimed that his former employer, defendant Saiia

Construction, L.L.C., gave him undesirable work assignments and terminated his employment

because of his race, African American, and in retaliation for accusing his supervisor of racism, all

in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and

42 U.S.C. § 1981. Plaintiff later amended his complaint to assert a claim that his termination also

violated the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* The action now is

before the court on defendant's motion for summary judgment (doc. no. 17).

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment "shall be

rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that

the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, "the plain

language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery

and upon motion, against a party who fails to make a showing sufficient to establish the existence

of an element essential to that party's case, and on which that party will bear the burden of proof at

trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).

48

In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.

The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).

Upon consideration of the pleadings, evidentiary submissions, and briefs, the court concludes that defendant's motion for summary judgment should be granted in part and denied in part.

## I. SUMMARY OF FACTS[1]

Defendant hired plaintiff for the position of "Heavy Equipment Operator" on January 17, 2000.[2] Plaintiff remained in that position until his employment was terminated on March 6, 2001, on the ground that he had violated the company's attendance policy.[3]

At the beginning of each shift, plaintiff reported to a dispatcher to receive his work assignment. Once plaintiff arrived at a job site, he was supervised by Robert Glass.[4]

During the initial part of plaintiff's employment, he was dispatched to jobs by Deland Trimble.[5] During that same period, plaintiff also received some work assignments from a dispatcher-

---

[1] The facts set forth below take into consideration the order entered on March 7, 2003 (doc. no. 38), striking plaintiff's evidentiary submissions tabbed 11 through 14, as well as portions of his brief opposing summary judgment.

[2] Defendant's brief, at 2. Plaintiff believed that his primary job function was to drive a "rock truck." Plaintiff's evidentiary submissions, Tab 1 (Tanniehill deposition), at 59-60.

[3] Plaintiff's evidentiary submissions, Tab 7 (Tanniehill termination notice dated Mar. 6, 2001).

[4] *Id.*, Tab 1 (Tanniehill deposition), at 91-92.

[5] Plaintiff mistakenly refers to Deland Trimble as "Tom Delaney" throughout his deposition. Plaintiff's brief, at 2 n.2. Plaintiff's evidentiary submissions, Tab 2 (Freese deposition), at 16.

in-training named Tom Piper.  At some unspecified point, plaintiff told Trimble that he believed Piper was a "racist."[6]  Plaintiff testified at deposition that he based his belief on "the way Tom Piper was treating [him]."[7]  Specifically, plaintiff stated that Piper assigned him to "little bogus jobs,"[8] once issued him incorrect directions to a job site, and generally gave him the cold shoulder.  Plaintiff elaborated the last accusation in the following manner:  "I know [Piper] always spoke to the white guys when they came in.  And when I came in, I'd speak to him, and he never would speak back to me.  He's just got things against blacks.  I mean, I can just — I can tell, you know."[9]

Trimble's employment with defendant was terminated a couple of weeks after plaintiff's comment,[10] and Piper took over Trimble's dispatcher position on November 20, 2000.[11]  About a month after Piper became dispatcher, plaintiff confronted Piper and accused him of being a racist.[12]  Piper made no reply.[13]  Plaintiff complains that Piper subsequently retaliated against him by assigning him to manual labor, rather than driving a rock truck, which was plaintiff's preferred duty.[14]  Plaintiff explained that Piper

> was sending me on these jobs going down in these holes putting pipes down in there. And I know he had laborers there to do that type of work. And one incident, he sent me to some guy's house to get these big logs to put in a wheelbarrow and push on the side of the road, and I didn't think that had anything to do with that company and the work that they did.[15]

---

[6] Plaintiff's evidentiary submissions, Tab 1 (Tanniehill deposition), at 117.

[7] *Id.* at 117-18.

[8] *Id.* at 116.

[9] *Id.* at 118-19.

[10] *Id.* at 162.

[11] *Id.*, Tab 3 (Piper deposition), at 7.

[12] Plaintiff's evidentiary submissions, Tab 1 (Tanniehill deposition), at 121-22.

[13] *Id.* at 122.

[14] *Id.* at 126-27.

[15] *Id.* at 124-25.

Plaintiff added that other employees were assigned to drive a rock truck, but Piper "always sent me to this labor work."[16]

## A.     Defendant's Written Attendance Policy

Around the time of his hire, plaintiff was issued a copy of the company's employee handbook and told to review it.  He was later tested on his knowledge of the handbook, which included the following provisions:[17]

> *Saiia* Construction reserves the right, in its sole discretion, to determine the appropriate discipline [for violations of the attendance policy] up to and including termination as warranted by the situation, in light of the employee's employment history and other relevant factors.
>
> . . .
>
> **Employee Responsibilities:**
>
> 1.     If an employee is unable to report to work as scheduled, the employee must notify his/her supervisor in accordance with the time deadline established by the respective facility.  (For example, certain operations require minimum notification of two (2) hours prior to start time in order to find a replacement).  The absence must be reported to the "direct supervisor".  If unable to contact the supervisor, the employee should leave a pager or voice mail message for the supervisor and then notify the second in charge or an individual in management that is somewhat related to the employee's job position.
>
> 2.     **It is imperative that the employee has a live conversation with a supervisor.  Messages left with co-workers or calls from relatives on the employee's behalf are "unacceptable", unless the employee is physically unable to make a phone call.**[18]

While the handbook does not define the term "physically unable," defendant submitted the affidavit

---

[16] *Id.* at 126.

[17] *Id.* at 56-58.

[18] Defendant's supplemental evidentiary submissions, Tab 7 (Saiia employee handbook), at 31 (emphasis in original).

of its human resources manager, Steve Freese, to explain defendant's interpretation of that term. According to Freese, an employee who is "unconscious or not mentally capable of making such a phone call" is considered "physically unable" to do so.[19]

Plaintiff began to experience acute knee pain on Sunday, February 18, 2001.[20]  He worked his scheduled shift the following day, but did not work another shift before his employment was terminated on March 6, 2001.[21]  Between his last day of work and termination, plaintiff experienced considerable difficulty contacting his employer, because there was no telephone in his residence and knee pain hindered his mobility.[22]  Even so, soon after plaintiff's knee trouble flared up, he walked to a neighbor's house and used the telephone to leave a recorded message for Glass, stating that his knees were swollen and he would be unable to work.[23]  Around the same time, plaintiff also had a telephone conversation with Piper, during which he told Piper that he needed to be absent from work for a few days because his knees were "swelling up."[24]  Piper instructed plaintiff to provide a doctor's excuse to validate the absences.  Plaintiff replied, "no problem."[25]  Plaintiff was largely confined to bed until he went to the hospital emergency room for treatment of knee pain on Sunday, February 25, 2001.[26]  Plaintiff was treated and released from the hospital that same day.[27]  After his trip to the hospital, plaintiff's mobility was restricted even further because he was under the

---

[19] Defendant's evidentiary submissions, Tab 6 (Freese affidavit) ¶ 2.

[20] Plaintiff's evidentiary submissions, Tab 1 (Tanniehill deposition), at 134.

[21] Defendant's evidentiary submissions, Tab 13 (responses to plaintiff's interrogatories), at 2.

[22] Plaintiff's evidentiary submissions, Tab 1 (Tanniehill deposition), at 22-23, 138-39.

[23] Id. at 133.

[24] Id. at 94-96.

[25] Id. at 97-98.

[26] Id. at 90.

[27] Plaintiff's evidentiary submissions, Tab 5 (Janice Williams deposition), at 64.

influence of "heavy medication" prescribed by his physician.[28]  Several days following his release

from the hospital, *i.e.*, March 7, 2001, plaintiff was diagnosed with gout by Theodis Buggs, Jr.,

M.D., who prescribed medication and further testing.[29]

Plaintiff did not personally have another conversation with his employer prior to his

termination; rather, he relayed messages through his aunt, Bettie Williams, and his common-law

wife, Janice Williams.  Janice Williams telephoned Piper on Monday, February 26, 2001, and

informed him that plaintiff would not be able to work until after his doctor's appointment, which was

scheduled for March 5, 2001.[30]  Piper then requested to speak with plaintiff directly.  Ms. Williams

explained that he was unable to reach a telephone, due to his medical condition.  Unconvinced, Piper

stated that the attendance policies set forth in the employee handbook required plaintiff to personally

call, and he could not delegate the responsibility to any other person.[31]  Ms. Williams subsequently

left several telephone messages with Piper, Glass, and an unnamed receptionist, seeking to

communicate information regarding plaintiff's condition.[32]

---

[28] *Id.*, Tab 1 (Tanniehill deposition), at 101.  At deposition, plaintiff was questioned as to the effects of the medication that he was taking while he was absent from work:

Q:      You weren't unconscious, were you?

A:      No, I wasn't.

Q:      You could speak, couldn't you?

A:      Yes, I could.

Q:      You were mentally capable of talking, weren't you?

A:      I don't know.  The medication I was taking, I mean, I just couldn't swear to that.

*Id.* at 102.

[29] *Id.*, Tab 17 (Tanniehill diagnosis dated Mar. 7, 2001).

[30] *Id.*, Tab 5 (Janice Williams deposition), at 80.

[31] *Id.* at 80-82.

[32] *Id.* at 84-89.

Plaintiff's aunt, Bettie Williams, also made and received several telephone calls for plaintiff. Unlike plaintiff and his common-law wife, Bettie Williams had a telephone in her home,[33] and plaintiff had listed her telephone number as a contact on his application for employment.[34] A few days after plaintiff's February 25th trip to the emergency room, Piper telephoned Ms. Williams, stating that he needed to speak with plaintiff.[35] Ms. Williams explained that plaintiff could not reach a telephone, and delivered Piper's message to plaintiff.[36] Piper again telephoned Ms. Williams again a few days later, and once more stated that plaintiff needed to get in touch with him. Ms. Williams delivered Piper's message to plaintiff.[37] In addition to these two telephone calls, an unidentified female employee of the defendant called Ms. Williams reiterating that plaintiff needed to call his supervisor.[38]

Plaintiff's employment was terminated on March 6, 2001, for violation of defendant's attendance policy. He had not spoken to his supervisor in approximately two weeks, despite Piper's repeated messages instructing plaintiff to telephone.[39]

---

[33] The record is not clear as to the exact distance between plaintiff's and Bettie Williams's homes. She described their relative location as follows:

> A. Graysville. See, Graysville is divided into two hills. There's a hill here, a hill there, and a valley in between (indicating). They are on this one, and I'm on that one.
>
> Q. So [Janice Williams] just moved to another hill in Graysville?
>
> A. No. The hill that they were living on is different from the one where I live.

Plaintiff's evidentiary submissions, Tab 4 (Bettie Williams deposition), at 14-15.

[34] *Id.*, Tab 1 (Tanniehill deposition), at 9-10.

[35] *Id.*, Tab 4 (Bettie Williams deposition), at 15-17.

[36] *Id.* at 17-18.

[37] *Id.* at 19-20.

[38] *Id.* at 22-23. Bettie Williams did not recall the date of this telephone conversation, or whether it had occurred prior to her conversations with Piper. *Id.*

[39] *Id.*, Tab 7 (Tanniehill termination notice dated Mar. 6, 2001).

## B.    Comparators

Plaintiff asserts that two former employees of defendant, both Caucasians, received more favorable treatment.

### 1.    Anthony Holt

Anthony Holt received at least five reprimands for attendance issues during his employment with defendant.[40]  While Holt apparently had many misadventures involving absenteeism, the court need recount only one incident for the purpose of adjudicating this motion.

Holt did not report to work or telephone his supervisor with an excuse on June 8 and 9, 2001. He later explained that he had laryngitis, and that his mother had telephoned on his behalf.  Holt's mother did not telephone an individual in Holt's supervisory chain of command, however.  Instead, she telephoned a receptionist at defendant's office.[41]  The receptionist, however, did not remember receiving the call.  Although this method of reporting an employee's absence from work did not conform to company policy,[42] he was not terminated.  Defendant's explanation for the disparate treatment was that Holt "was allegedly physically unable to call-in and because Saiia could not confirm that Holt's mother had not called-in on those days."[43]  This justification fails to address the fact that Holt actually did not meet defendant's definition of "physically unable," because there is no evidence that Holt was either "unconscious or not mentally capable of making such a phone call."[44]

---

[40] *Id.*, Tab 21 (Holt personnel file), at Bates Stamp number 5955 (Holt reprimand dated May 30, 2001).

[41] Defendant's supplementary evidentiary submissions, Tab 1 (Second Freese affidavit) ¶ 13.

[42] *Id.*, Tab 7 (Saiia employee handbook), at 31.

[43] Defendant's supplemental brief, at 5 (emphasis in original).

[44] Defendant's evidentiary submissions, Tab 6 (First Freese affidavit) ¶ 2.

### 2.    Albert Tims

Tims's employment with defendant was terminated on August 3, 2001, "for failing to call or report in for two consecutive days."[45]  He was re-hired, however, on September 21, 2001, and terminated yet again a little over a month later.[46]  Defendant's human resources manager, Steve Freese, adds that plaintiff "could have reapplied like Mr. Tims, but he did not do so."[47]  It is not clear whether plaintiff was actually aware that he was eligible for re-hire.[48]  It is noteworthy, however, that Tims's termination notice specified his eligibility, while plaintiff's did not.[49]

## II. DISCUSSION

### A.    Title VII and § 1981 Claims

Plaintiff asserts that he was subjected to disparate treatment and retaliation based on his race with respect to his work assignments and termination, in violation of both Title VII and 42 U.S.C. § 1981.  Under these circumstances, both statutes require the same elements of proof to establish liability, and the court will examine plaintiff's Title VII claim "with the express understanding that the analysis applies to [his § 1981] claim as well." *Holiness v. Moore-Handley, Inc.*, 114 F. Supp. 2d 1176, 1181 (N.D. Ala. 1999) (citing *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)); *see also, e.g., Sullivan v. National Railroad Passenger Corp.*, 170 F.3d 1056, 1058-61 (11th Cir. 1999) (treating the sufficiency of the evidence to sustain a retaliation claim brought under Title VII and § 1981 with a single analysis).

---

[45] Defendant's supplementary evidentiary submissions (Second Freese affidavit) ¶ 22.

[46] *Id.* ¶¶ 23, 25.

[47] *Id.* ¶ 24.

[48] Plaintiff's supplemental brief cites page 41 in Freese's deposition as the source for his statement that "Freese never told [plaintiff] that he was eligible for re-hire." Plaintiff's supplemental brief, at 8.  However, page 41 of that deposition contains no such information.

[49] Plaintiff's evidentiary submissions, Tab 7 (Tanniehill termination notice dated Mar. 6, 2001); plaintiff's supplementary evidentiary submissions, Tab 22 (Tims termination notice dated Aug. 7, 2001).

Plaintiff does not present any direct evidence of racial or retaliatory animus on the part of defendant. Therefore, in order to survive summary judgment, he must successfully navigate the burden-shifting framework first discussed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and elaborated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). *See also St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). Under that now familiar framework, plaintiff bears the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824; *see also Burdine*, 450 U.S. at 253-54 & n.6, 101 S. Ct. at 1093-94 & n.6. "The effect of the presumption of discrimination created by establishment of the prima facie case is to shift to the employer the burden of producing legitimate, non-discriminatory reasons for the challenged employment action." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824; *Burdine*, 450 U.S. at 254, 101 S. Ct. at 1094). To rebut the presumption of intentional discrimination raised by a plaintiff's demonstration of a prima facie case, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the [contested employment decision]." *Burdine*, 450 U.S. at 255, 101 S. Ct. at 1094. If a defendant carries its burden of producing "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by [a] discriminatory animus," *Burdine*, 450 U.S at 257, 101 S. Ct. at 1096, the presumption of discrimination created by the prima facie case "drops from the case," and "the factual inquiry proceeds to a new level of specificity." *Id.* at 255 n.10, 101 S. Ct. at 1094-95 n.10. The burden then shifts to the plaintiff to "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit

-10-

a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision," but merely pretext for intentional discrimination. *Combs*, 106 F.3d at 1528 (citing *Burdine*, 450 U.S. at 256, 101 S. Ct. at 1095; *McDonnell Douglas*, 411 U.S. at 804, 93 S. Ct. at 1825). *Cf. Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148, 120 S. Ct. 2097, 2109, 147 L. Ed. 2d 105 (2000) (holding that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."). If a plaintiff does so, then he or she "is entitled to survive summary judgment." *Combs*, 106 F.3d at 1529. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143, 120 S. Ct. at 2106.

### 1.     Disparate treatment

In order to set forth a prima facie case of disparate treatment, plaintiff must establish that he: (i) is a member of a protected class; (ii) was subjected to an adverse employment action; (iii) was treated less favorably than similarly-situated individuals outside his protected class; and (iv) was qualified to perform the job in question. *See, e.g., Scott v. Suncoast Beverage Sales, Inc.*, 295 F.3d 1223, 1228 (11th Cir. 2002) (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824; and *Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001)).

### a.     Work assignments

Plaintiff's disparate treatment claim regarding work assignments fails because he has not established a prima facie case, nor can race discrimination otherwise be reasonably inferred from his vague assertions with respect to that claim.

### i.     No adverse employment action

-11-

Plaintiff has failed to show that the few occasions on which he was assigned to jobs he considered to be undesirable constituted an adverse employment action. An employment action does not become "adverse" simply because an employee dislikes it, or disagrees with it. *See, e.g., Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir. 1996) ("not everything that makes an employee unhappy is an actionable adverse action"). That is because "Title VII[] is neither a 'general civility code' nor a statute making actionable the 'ordinary tribulations of the workplace.'" *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999) (citation omitted).

"An employment action is considered 'adverse' only if it results in some tangible, negative effect on the plaintiff's employment." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001) (discussing the concept of an "adverse" employment action in the context of an ADA retaliation claim); *see also, e.g., Gupta v. Florida Board of Regents*, 212 F.3d 571, 587 (11th Cir. 2000) (holding, in context of Title VII retaliation claim, that "[a]n adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.'") (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997)). *Cf. Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S. Ct. 2257, 2268, 141 L. Ed. 2d 633 (1998) (holding, in context of Title VII sexual harassment claim, that "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.")

"Conduct that falls short of an ultimate employment decision must meet 'some threshold level of substantiality . . . to be cognizable.'" *Gupta*, 212 F.3d at 587 (quoting *Wideman v. Wal-Mart*

-12-

*Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998)). In other words, a plaintiff "must show a serious and material change" in the terms, conditions, or privileges of his job before an employment action can be described as "adverse." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001).

Here, there is no evidence that the terms or conditions of plaintiff's employment were affected by his assignment to non-driving jobs. The record reflects that plaintiff was paid the same hourly wage, regardless of his job assignment.[50] Further, the evidence indicates that plaintiff was assigned to truck-driving duties more often than not. Despite the fact that plaintiff received work assignments from Piper for several months, he can point to only three incidents when he was not assigned his preferred job.[51] In summary, plaintiff's occasional assignment to non-driving jobs falls far short of constituting "a serious and material change" in the terms and conditions of his employment, regardless of whether those assignments are considered individually or in the aggregate. Consequently, those assignments do not rise to the level of an actionable adverse employment action. *See Davis*, 245 F.3d at 1239.

### ii.    No evidence that plaintiff received less favorable treatment

Plaintiff also cannot establish the third element of a prima facie case: he has failed to demonstrate that he was treated less favorably than similarly-situated Caucasian employees, with regard to job assignments. Plaintiff's asserts in his brief opposing summary judgment that he observed only non-Caucasian employees performing manual labor. Plaintiff's observation, standing alone, does not constitute evidence from which a reasonable jury could adduce that plaintiff received less favorable treatment than similarly-situated Caucasian workers. Plaintiff does not specify

---

[50] Plaintiff's evidentiary submissions, Tab 1 (Tanniehill deposition), at 127.

[51] *Id.* at 124-25, 131.

whether any of the other non-Caucasian employees who performed manual labor were qualified to operate heavy equipment. Moreover, plaintiff has failed to show that he was assigned to manual labor jobs with a significantly greater frequency than similarly-situated Caucasian heavy equipment operators. Consequently, summary judgment is due to be granted on his race discrimination claim regarding job assignments.

###  b.  Termination

Plaintiff has established a prima facie case with regard to the claim based upon his termination. Plaintiff, as an African-American male whose employment was terminated, satifisfies the first two elements. Further, there is no dispute that plaintiff was qualified to perform his job. The only element that requires extended analysis is whether plaintiff has demonstrated that he received less favorable treatment than similarly situated Caucasian employees.

The record reflects that defendant was, in fact, continually informed of the reason plaintiff was absent from work. Even so, defendant terminated plaintiff's employment because he did not comply with the company's procedural requirement that he personally telephone his supervisor, if he was "physically []able" to do so. Plaintiff asserts that he was "physically unable" to telephone his supervisor and, thus, should have been permitted to relay messages relating to his continued absence from work through his common-law wife and aunt. Plaintiff was not given the benefit of the doubt on this point and was terminated.

In comparison, the record reveals that a Caucasian employee, Anthony Holt, received more favorable treatment than plaintiff, in at least two respects. First, Holt was deemed to be "physically unable" to have a telephone conversation because of laryngitis, even though he actually failed to meet defendant's criteria for "physically unable" *i.e.*, his laryngitis neither rendered him *unconscious*

-14-

nor *mentally incapable* of placing a telephone call.  Second, defendant was unable to confirm that Holt's mother had actually called on his behalf, because the receptionist who allegedly received her telephone call did not remember the event.  Further, Holt's mother did not call an individual in Holt's supervisory chain of command, as required by company policy.  Despite these deviations from defendant's stated policy, Holt was given the benefit of the doubt, and his employment was not terminated.  In sharp contrast, plaintiff received no benefit of the doubt regarding his condition, despite the fact that two of his relatives regularly communicated with plaintiff's supervisors regarding his condition.  In light of these facts, a reasonable jury could conclude that plaintiff received treatment less favorable than that afforded Holt.

The inquiry does not end there, however.  The court also must determine whether plaintiff and Holt are proper comparators because, "[a]bsent some other similarly situated but differently disciplined worker, there can be no disparate treatment."  *Abel v. Dubberly*, 210 F.3d 1334, 1339 (11th Cir. 2000); *Walker v. Mortham*, 158 F.3d 1177, 1193 (11th Cir. 1998) (holding that "a Title VII plaintiff cannot succeed in proving that [he] was intentionally discriminated against if [he] does not establish a prima facie case of discrimination").  For two individuals to be deemed similarly situated, the "quality and quantity of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples and oranges."  *Maniccia v. Brown,* 171 F.3d 1364, 1368-69 (11th Cir. 1999) (citing *Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 19 (1st Cir. 1989) ("Exact correlation is neither likely nor necessary, but the cases must be fair congeners.  In other words, apples should be compared to apples.")).  Thus, plaintiff must show that employees outside his protected class were found guilty of the same or "nearly identical" misconduct, yet were disciplined in different ways.  *Id.*; *see also,*

-15-

*e.g., Silvera v. Orange County School Board*, 244 F.3d 1253, 1259 (11th Cir. 2001) ("The most important factors in the disciplinary context . . . are the nature of the offenses committed and the nature of the punishments imposed.").

Defendant argues that plaintiff and Holt are not similarly situated because Holt was not absent for more than two consecutive work days and Holt's pending workers' compensation claim caused defendant to fear that terminating Holt would trigger a wrongful discharge claim. The relevant inquiry here, however, is whether defendant applied its definition of "physically unable" with equal force to plaintiff and Holt. For the purpose of making that determination, plaintiff and Holt are fairly deemed to be comparators.

A jury may well find that Holt and plaintiff were treated differently for some reason other than race. As indicated above, however, defendant's proffered nondiscriminatory reasons for terminating plaintiff's employment and *not* terminating Holt's employment, pursuant to the absenteeism policy, reveal several inconsistencies from which a reasonable trier of fact could disbelieve those proffered reasons and find pretext. Accordingly, summary judgment is due to be denied on that portion of plaintiff's race discrimination claim premised on his termination.

### 2.    Retaliation

Plaintiff asserts that, after he called Piper a racist in late 2000, Piper retaliated against him by assigning him to undesirable jobs and by terminating his employment. Plaintiff's Title VII retaliation claim fails for the simple reason that he did not assert a retaliation claim in the charge of discrimination he filed with the Equal Employment Opportunity Commission. "As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in [his] EEOC charge. . . . [A]llowing a complaint to encompass allegations outside the ambit of the predicate EEOC

-16-

charge would frustrate the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge." *Cheek v. Western and Southern Life Insurance Co.*, 31 F.3d 497, 500 (7th Cir. 1994) (citations omitted).[52]

In contrast, however, there are no administrative prerequisites to the maintenance of a § 1981 claim. Neither the filing of an EEOC charge of discrimination within 180 days of the alleged unlawful employment practice, nor "resort to Title VII's administrative machinery are . . . prerequisites for the institution of a § 1981 claim." *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 460, 95 S. Ct. 1716, 1720, 44 L. Ed. 2d 295 (1975) (citation omitted). Thus, plaintiff's retaliation claim can proceed under the provisions of § 1981.

A plaintiff generally must prove three elements to establish a prima facie case of retaliation: (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there was a causal linkage between the protected conduct and the adverse employment action. *See, e.g., Bass v. Board of County Commissioners*, 256 F.3d 1095, 1117 (11th Cir. 2001); *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 507 (11th Cir. 2000); *Gupta*, 212 F.3d at 587; *Wideman*, 141 F.3d at 1455; *Little v. United Technologies*, 103 F.3d 956, 959 (11th Cir. 1997); *Meeks v. Computer Associates International*, 15 F.3d 1013, 1021 (11th Cir. 1994); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993).

Plaintiff has failed to establish that he engaged in any statutorily protected expression. Plaintiff claims that his calling Tom Piper a "racist" on two occasions constitutes statutorily protected opposition to discrimination in the workplace. More specifically, plaintiff told Deland

---

[52]As the Seventh Circuit has observed, "[t]his rule serves the dual purpose of affording the EEOC and the employer an opportunity to settle the dispute through conference, conciliation, and persuasion, and of giving the employee some warning of the conduct about which the employee is aggrieved." *Cheek v. Western and Southern Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994) (citations omitted).

Trimble that he thought that Piper was a "racist," and later directly called Piper a "racist." Plaintiff did not explain the basis of his accusations either to Trimble or Piper.[53]

Title VII's "opposition clause" bars an employer from retaliating against any employee who "has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). Plaintiff's accusations of Piper's racism do not fall within the protective ambit of that statute (or § 1981), because such accusations do not reasonably communicate opposition to any identifiable workplace practice. *See, e.g., E.E.O.C. v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1013 (9th Cir. 1983) (holding that an employee's statement "cannot be opposed to an unlawful employment practice unless it refers to *some* practice by the employer that is allegedly unlawful") (internal quotation marks and citations omitted) (emphasis in original). Accordingly, plaintiff's retaliation claim is due to be dismissed.

**B.     Family and Medical Leave Act**

Plaintiff contends that defendant's failure to grant him medical leave, as well as its failure to restore his employment status after his absence, violated the provisions of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601-2654.

Under the FMLA, an eligible employee is entitled to up to twelve weeks of leave each year to care for a serious health condition of the employee, or the employee's child, spouse, or parent. *See* 29 U.S.C. § 2612(a)(1).[54]  The FMLA further provides:

---

[53] Plaintiff's evidentiary submissions, Tab 1 (Tanniehill deposition), at 117-21.

[54] 29 U.S.C. § 1612(a)(1) establishes an eligible employee's entitlement to leave as follows:

Subject to section 2613 of this title, an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following:

(A) Because of the birth of a son or daughter of the employee and in order to care for such son or daughter.

any eligible employee who takes leave under section 2612 of this title for the intended purpose of the leave shall be entitled, on return from such leave —

> (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or

> (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.

29 U.S.C. § 2614(a)(1)(A)-(B).  There is no dispute that defendant is an employer subject to the provisions of the FMLA, or that plaintiff is an "eligible employee," as that term is defined by the FMLA.[55]

To secure the availability of the entitlements provided in the FMLA, Congress declared it "unlawful for any employer to interfere with, restrain, or deny the exercise of[,] or the attempt to exercise, any right provided under this subchapter [of the FMLA]."  29 U.S.C. § 2615(a)(1).  In addition, Congress declared it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]," 29 U.S.C. § 2615(a)(2), *or* because such individual:

> (1) has filed any charge, or has instituted or caused to be instituted any proceedings, under or related to [the FMLA];

> (2) has given, or is about to give, any information in connection with any inquiry or proceeding relating to any right provided under [the FMLA]; or

---

(B) Because of the placement of a son or daughter with the employee for adoption or foster care.

(C) In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter  or parent has a serious health condition.

(D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

[55]An "eligible employee" is defined as "an employee who has been employed — (i) for at least 12 months by the employer with respect to whom leave is requested under section 2612 of this title; and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period."  29 U.S.C. § 2611(2)(A).

(3) has testified, or is about to testify, in any inquiry or proceeding relating to any right provided under [the FMLA].

29 U.S.C. § 2615(b); *see also* 29 C.F.R. § 825.220(c) ("An employer is prohibited from discriminating against employees . . . who have used FMLA leave.").

Consistent with the foregoing statutory provisions, the caselaw interpreting the FMLA recognizes two types of claims for alleged violations of the Act: "*interference claims*, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act . . . and *retaliation claims*, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act. . . ." *Strickland v. Water Works and Sewer Board of the City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001) (emphasis added) (citations and footnote omitted). *Accord O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349, 1352 (11th Cir. 2000). Plaintiff asserts an interference claim.[56]

In order to maintain an interference claim under the FMLA, "a plaintiff need only demonstrate that he was entitled to [a substantive FMLA right] but denied the right. He does not have to allege that his employer intended to deny the right; the employer's motives are irrelevant." *Strickland*, 239 F.3d at 1208.

The FMLA provides that a covered employee may take medical leave for serious health conditions, and protects the employee's right, upon return to work, to be placed in the same or an equivalent position. *See* 29 U.S.C. §§ 2612(a)(1)(D) and 2614(a). The FMLA's definition of "serious health condition" includes any "illness, injury, impairment, or physical or mental condition that involves . . . continuing treatment by a health care provider." 29 U.S.C. § 2611(12). In situations where the need for leave unexpectedly arises, the regulations implementing the FMLA

---

[56]Plaintiff's brief at 13, 27.

direct that the employee give notice of the need to take leave "as soon as practicable." 29 C.F.R. §

825.303(a).  That phrase has been interpreted to mean that, under normal circumstances, an

employee should contact his employer no later than two days after learning of the need to take

medical leave. *Id.*[57]

Drawing all inferences in favor of the non-moving party, plaintiff's knee ailment qualified

as a serious health condition.  Additionally, it is apparent that plaintiff's ailment was unforeseeable.

The more difficult question is whether he notified his employer of the need to take medical leave in

a timely and accurate manner; plaintiff could not recall exactly when he telephoned his supervisors.

What can be gleaned from plaintiff's rather confusing testimony is that, before he went to the

hospital, he spoke with Piper directly (and recorded a message on Glass's answering machine), and

told both men that he would need time off from work because his knees were swollen.[58]  Given that

---

[57] The relevant section of the C.F.R. provides, in pertinent part:

What are the requirements for an employee to furnish notice to an employer where the need for FMLA leave is not foreseeable?

(a) *When the approximate timing of the need for leave is not foreseeable, an employee should give notice to the employer of the need for FMLA leave as soon as practicable under the facts and circumstances of the particular case. It is expected that an employee will give notice to the employer within no more than one or two working days of learning of the need for leave, except in extraordinary circumstances where such notice is not feasible.*  In the case of a medical emergency requiring leave because of an employee's own serious health condition or to care for a family member with a serious health condition, written advance notice pursuant to an employer's internal rules and procedures may not be required when FMLA leave is involved.

(b) The employee should provide notice to the employer either in person or by telephone, telegraph, facsimile ("fax") machine or other electronic means.  *Notice may be given by the employee's spokesperson (e.g., spouse, adult family member or other responsible party) if the employee is unable to do so personally. The employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed.*  The employer will be expected to obtain any additional required information through informal means.  The employee or spokesperson will be expected to provide more information when it can readily be accomplished as a practical matter, taking into consideration the exigencies of the situation.

29 C.F.R. § 825.303 (emphasis supplied).

[58] Plaintiff's evidentiary submissions, Tab 1 (Tanniehill deposition), at 91-97, 133-35.

plaintiff had difficulty walking and did not have a telephone in his home, one could reasonably conclude that plaintiff contacted his employer "as soon as practicable." Further, plaintiff's communications adequately put his employer on notice that he might be entitled to FMLA leave. Piper even demanded that plaintiff produce a doctor's excuse to validate the absences.[59] Plaintiff has adequately demonstrated that he was entitled to avail himself of the benefit of the FMLA, but that such benefit was denied. Accordingly, summary judgment is due to be denied on plaintiff's FMLA "interference" claim.[60]

### III. CONCLUSION

In accordance with the foregoing, defendant's motion for summary judgment is due to be denied as to plaintiff's race discrimination claim based upon the termination of his employment and his FMLA claim, but granted in all other respects. An order consistent with this memorandum opinion shall be entered contemporaneously herewith.

DONE this ___17th___ day of June, 2003.

_____

United States District Judge

---

[59] *Id.* at 97-98.

[60] Defendant contends that plaintiff's "notice" to the company that he required medical leave was inadequate because plaintiff did not follow the procedures set forth in the employee handbook, which stipulate that plaintiff was required to contact defendant's human resources department, in the event that he desired to take medical leave. Such an argument is unavailing because the page of the employee handbook that defendant cites contains no such provision. *See* defendant's brief, at 26.